IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
January 13, 2015 Session

## GLENNA RANDOLPH INMAN v. ROBERT ALLAN INMAN, JR.

**Appeal from the Circuit Court for Hamilton County**
**No. 13D-454     L. Marie Williams, Judge**

---

**No. E2014-01163-COA-R3-CV-FILED-MAY 26, 2015**

---

In this divorce case, Robert Allan Inman, Jr. (Husband) appeals the trial court's decision awarding Glenna Randolph Inman (Wife) alimony in futuro of $1,900 per month. We hold that the court's decision is supported by a number of relevant statutory factors, including the twenty-nine year duration of the marriage, Wife's age, sixty-three at the time of trial, her poor physical condition, Husband's good physical condition, his higher earning capacity, Wife's demonstrated need, and Husband's ability to pay. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

John T. Rice, Chattanooga, Tennessee, for the appellant, Robert Allan Inman, Jr.

Leslie B. McWilliams, Chattanooga, Tennessee, for the appellee, Glenna Randolph Inman.

## OPINION

### I.

Wife filed for divorce on February 21, 2013. Husband filed an answer and counterclaim on April 9, 2013. Wife filed a motion for alimony pendente lite, which the trial court granted, by order entered December 18, 2013, in the amount of $2,000 per month. The parties entered into a mediated settlement agreement that addressed and

disposed of all issues save alimony. The question of alimony was tried before the court on March 6, 2014. Only the parties testified. Husband argued that Wife was voluntarily underemployed. Wife asserted that she was working as much as she could, given her poor health condition and her other circumstances. On April 17, 2014, the trial court entered a final judgment approving and incorporating the settlement agreement. The court awarded Wife alimony in futuro of $1,900 per month.

## II.

Husband appeals, raising two issues:

1. Did the trial court err in awarding Wife alimony in futuro?

2. Did the trial court err in finding that Wife was not voluntarily underemployed?

## III.

The Supreme Court has provided the standards and principles that guide our review of a trial court's alimony decision:

> For well over a century, Tennessee law has recognized that trial courts should be accorded wide discretion in determining matters of spousal support. This well-established principle still holds true today, with this Court repeatedly and recently observing that trial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award.
>
> Equally well-established is the proposition that a trial court's decision regarding spousal support is factually driven and involves the careful balancing of many factors. As a result, "[a]ppellate courts are generally disinclined to second-guess a trial judge's spousal support decision." Rather, "[t]he role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable." Appellate courts decline to second-guess a trial court's decision absent an abuse of discretion. An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical

2

result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice. This standard does not permit an appellate court to substitute its judgment for that of the trial court, but " 'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.' " Consequently, when reviewing a discretionary decision by the trial court, such as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision.

*Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105-06 (Tenn. 2011) (internal citations and footnote omitted).

Our review of this non-jury case is de novo upon the record of the proceedings below with a presumption of correctness as to the trial court's factual findings, a presumption we must honor unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d). We review the trial court's conclusions of law de novo with no presumption of correctness. *Oakes v. Oakes*, 235 S.W.3d 152, 156 (Tenn. Ct. App. 2007).

IV.

Husband argues that the trial court erred in awarding Wife alimony in futuro. In view of this argument, we will review recent observations of the Supreme Court on the subject of alimony:

Tennessee recognizes four distinct types of spousal support: (1) alimony in futuro, (2) alimony in solido, (3) rehabilitative alimony, and (4) transitional alimony. Tenn. Code Ann. § 36-5-121(d)(1) (2010 & Supp.2012). Alimony in futuro, a form of long-term support, is appropriate when the economically disadvantaged spouse cannot achieve self-sufficiency and economic rehabilitation is not feasible. *Gonsewski*, 350 S.W.3d at 107. Alimony in solido, another form of long-term support, is typically awarded to adjust the distribution of the marital estate and, as such, is generally not modifiable and does not terminate upon death or remarriage. *Id.* at 108. By

3

contrast, rehabilitative alimony is short-term support that enables a disadvantaged spouse to obtain education or training and become self-reliant following a divorce. *Id.*

Where economic rehabilitation is unnecessary, transitional alimony may be awarded. Transitional alimony assists the disadvantaged spouse with the "transition to the status of a single person." *Id.* at 109 (internal quotation marks omitted). Rehabilitative alimony "is designed to increase an economically disadvantaged spouse's *capacity* for self-sufficiency," whereas "transitional alimony is designed to aid a spouse who already possesses the capacity for self-sufficiency but needs financial assistance in adjusting to the economic consequences of establishing and maintaining a household without the benefit of the other spouse's income." *Id.* Consequently, transitional alimony has been described as a form of short-term "bridge-the-gap" support designed to "smooth the transition of a spouse from married to single life."

Transitional alimony is payable for a definite period of time and may be modified only if: (1) the parties agree that it may be modified; (2) the court provides for modification in the divorce decree, decree of legal separation, or order of protection; or (3) the recipient spouse resides with a third person following the divorce. Tenn. Code Ann. § 36-5-121(g)(2).

Tennessee statutes concerning spousal support reflect a legislative preference favoring rehabilitative or transitional alimony rather than alimony in futuro or in solido. *See* Tenn. Code Ann. § 36-5-121(d)(2)-(3); *Gonsewski*, 350 S.W.3d at 109. . . . Decisions regarding the type, length, and amount of alimony turn upon the unique facts of each case and careful consideration of many factors, with two of the most important factors being the disadvantaged spouse's need and the obligor spouse's ability to pay. *Id.* at 109-10.

*Mayfield v. Mayfield*, 395 S.W.3d 108, 115-16 (Tenn. 2012) (internal citation omitted; emphasis in original).

4

Tennessee courts making an alimony decision must consider the following statutory factors when relevant:

> (1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
> (2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;
> (3) The duration of the marriage;
> (4) The age and mental condition of each party;
> (5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
> (6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;
> (7) The separate assets of each party, both real and personal, tangible and intangible;
> (8) The provisions made with regard to the marital property, as defined in § 36-4-121;
> (9) The standard of living of the parties established during the marriage;
> (10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;
> (11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and
> (12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-121(i) (2014).

The trial court addressed and applied several of these factors in its order granting alimony pendente lite, stating in pertinent part as follows:

5

The Court finds this is a marriage of 29 years. [Wife] is 63 years old and [Husband] is 60 years old. There are two adult children of the marriage. Although both parties were employed at the time they were married, [Wife] did not work after the children were born until she worked part-time at a preschool the younger child was attending. . . . It is clear from an examination of the earnings of both parties that [Husband] has a substantially greater earning capacity than does [Wife] and has the greater opportunity for future earnings and accumulation of income. . . . [Wife] has significant health problems that impede her ability to earn. She is receiving Social Security benefits. Whereas, she is not paying COBRA at the moment, she will be in the future. [Husband] was giving her $745.00 every four weeks after their separation.

At trial, Husband testified that he had worked as a letter carrier for the U.S. Postal Service for twenty-six years. Regarding the possibility of his retirement, Husband stated, "well, I guess I'm eligible when I turn [sixty-three], in another couple of years, but I don't intend to. My health is good." In 2012, Husband's gross pay was $61,339.51, or $5,111.63 per month. In 2013, Husband earned $57,132.05, or $4,761 per month. The evidence shows that Husband earns roughly $4,700 per month. His take-home pay has been significantly less, but this is because he has elected to have substantial discretionary deductions taken out of his bi-weekly paychecks. For example, Husband has $240.60 per month deducted for life insurance premiums. Other monthly deductions include $260 deposited directly to his checking account,[1] $614.64 to his retirement account, and $493.94 representing repayment of a loan against his 401(k) account. At the time of trial, one of the parties' adult sons was living with Husband in an apartment and contributing $120 per month towards rent. Husband presented evidence that his total monthly expenses were $2,469.

Wife testified that she has significant health problems. She stated that she had a right shoulder replacement that resulted in permanent nerve damage; replacement surgeries for both her left and right hips; and left shoulder replacement surgery. Other medical problems are as follows: inner ear and balance problems, osteoporosis, and benign nodules on her thyroid gland. Her thyroid condition requires an annual ultrasound evaluation. Wife testified that she was taking seven different prescriptions. She had been insured under Husband's health insurance, but anticipated that she would have to pay for COBRA coverage at a rate of $588 per month after the divorce.

---

[1] This deduction is curious. It may be that the bank account into which the $260 deduction was deposited is different from the bank account into which Husband's net wages were deposited.

Wife works part-time as a substitute teacher. In response to Husband's allegation that she had frequently turned down substitute teaching jobs, Wife testified, "I feel like I'm doing really well if I can substitute two or maybe three days a week with my physical conditions and the side effects of medication." Wife said she was working as much as her physical condition would permit, and that "it is my intention to do what I can do for as long as I can do it." She earns approximately $56 per day for substitute teaching. Wife testified that her gross income was $319.34 monthly; her net income was $278.51. She receives Social Security benefits in the amount of $740, bringing her total monthly income to $1,018.51. She presented evidence of monthly expenses totaling $2,909, for a monthly deficit of $1,890.49. Wife said that "on several occasions, [Husband] asked me to apply for Social Security Disability. He said that he felt that I could get it and . . . was quite insistent."

As already stated, the parties entered into a settlement agreement that resolved all issues, including property division, but not alimony. According to the parties' proposed division of assets and liabilities, Wife received assets worth $12,903 and liabilities of $3,787, for a net value of $9,116. Husband received assets worth $7,652 and liabilities of $13,459, for a net of negative $5,807. Additionally, the marital residence, unencumbered and valued at approximately $160,000, was to be sold and the proceeds split equally. Husband also agreed to pay Wife 50% of his retirement plan, with her share being reduced by $5,000,[2] and 50% of the value of his postal service pension as of the date of divorce.

The trial court, after hearing the parties' testimony, entered a memorandum opinion stating in pertinent part:

> [T]he Court finds [Wife] is economically disadvantaged compared to [Husband]. Additionally, the Court finds she is not capable of being rehabilitated and transitional alimony is not appropriate for this situation. In determining whether or not alimony should be paid, the Court incorporates the findings of its December 18, 2013 Order [granting alimony pendente lite] and supplements these by finding [Husband] assumed more of the debt than did [Wife] and she received more of the assets. Fault is not a factor the Court deems appropriate to consider in this cause. Neither party is adhering to the standard of living established during the

---

[2] The value of Husband's USPS Thrift Plan was approximately $239,000. Thus, Wife received about $114,500 (half of the plan amount less $5,000), and Husband received about $124,500 in the parties' agreed division of this asset.

marriage. Both parties have made tangible and intangible contributions to the marital estate. The Court finds the gross earnings of [Husband] substantially greater than those of [Wife] and further finds his disposable income is reduced substantially by expenditures which save for his future to the exclusion of [Wife]. He contributes to a 401(k), and has a loan payment deducted directly from his paycheck. He contributes to a thrift plan and puts $130.00 every two weeks into his checking account for his own benefit. [Husband] does not include in his income statement the monies his son contributes to the household. *While [Husband] contends [Wife] should be taking more work as a substitute teacher than she does, the Court finds her explanations for not taking more work credible and logical.*

Accordingly, the Court finds [Husband] shall pay $1,900.00 per month alimony in futuro to [Wife]. Additionally, the Court finds he owes an arrearage of $2,405.00 in past due alimony which shall be paid at the rate of $100.00 per month. Further, the Court finds he shall maintain [Wife] on his current life insurance policy at the present policy limit to secure the alimony.

(Emphasis added.)

The evidence does not preponderate against the findings of the trial court. Looking at the pertinent statutory factors in light of the proof presented, the following factors support the trial court's decision to award alimony in futuro in the amount of $1,900 per month: (1) Wife's demonstrated need; (2) Husband's ability to pay; (3) the long-term twenty-nine year duration of the marriage; (4) Wife's age, poor health, and relatively small earning capacity; and (5) Wife's intangible contributions to the marriage, including her efforts as mother to the parties' two children and homemaker. The determination that Wife was not voluntarily underemployed was driven in large part by the trial court's in-person assessment of the witnesses' demeanor and credibility. We find no abuse of discretion in the court's resolution of this issue.

Wife argues that she should be awarded her attorney's fees on appeal, on the authority of Tenn. Code Ann. § 36-5-103(c) (2014), which provides:

The plaintiff spouse may recover from the defendant spouse . . . reasonable attorney fees incurred in enforcing any decree

> for alimony. . . both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.

As a further ground supporting her claim for attorney's fees on appeal, Wife argues that Husband's appeal in this case is frivolous. We do not find his appeal to be frivolous. We also do not believe Wife is entitled to her fees on appeal under Tenn. Code Ann. § 36-5-103(c).

## V.

The judgment of the trial court is affirmed. Costs on appeal are assessed to the appellant Husband, Robert Allan Inman, Jr. The case is remanded for enforcement of the trial court's judgment and collection of costs assessed below, pursuant to applicable law.

_____
CHARLES D. SUSANO, JR., CHIEF JUDGE